James H. ROSE, et al., Plaintiffs,

v.

The VILLAGE OF PENINSULA,
et al., Defendants.

No. 5:93CV1.

United States District Court,
N.D. Ohio, E.D.

Dec. 1, 1993.

Augustin F. O'Neil, Melissa Graham–Hurd, Akron, OH, for plaintiffs.

Mark H. Ludwig, Leland D. Cole, Cole Co., Akron, OH, Alan E. Johnson, Leo R. Ward, Ward & Associates, Cleveland, OH, for defendants.

## ORDER

SAM H. BELL, District Judge.

Now pending before the court are three motions to dismiss. The first was filed on behalf of all defendants (docket # 11). The second was filed on behalf of defendant Redmon based on qualified immunity (docket # 12). The last motion to dismiss was filed on behalf of defendant Ruoff based on theories of judicial and qualified immunity.

The complaint is divided between factual allegations by plaintiff Rose and factual allegations by plaintiff Becker.

### THE ROSE ALLEGATIONS

Rose alleges that Mayor Ruoff, Officer Redmon and the Village replaced signs on State Route 303 with signs that were 15 m.p.h. lower than the speed authorized by state law. Allegedly this was done sometime before July 9, 1991 for the purpose of increasing Village revenues. Rose also alleges a variety of Village actions indicating that Peninsula was having financial problems and further states that Ruoff advised the police to charge people with violations of Village ordinances rather than state violations so that the municipality could collect any fees or fines.

On July 9, 1991, at 6:25 a.m., Rose was stopped by Redmon and cited for going 52 m.p.h. in a section posted 35 m.p.h. Rose claims first, that the road signs were unauthorized because the state has no record of a request to reduce the speed and had not granted such a request. Second, Rose claims that Redmon's radar gun was 20% inaccurate. Third, Rose claims that the intersection of Dogwood Lane and Rt. 303 (referred to on the citation) is not within the boundaries of Peninsula.

Based on Redmon's seizure of Rose pursuant to the moving violation, Redmon also came to believe that Rose had an expired driver's license. Therefore, Rose was given two citations and summons which required Rose to appear in Peninsula Mayor's Court.

Rose first obtained a continuance and then appeared *pro se* on August 14, 1991. Following his plea of not guilty, Rose was tried before Mayor Ruoff who found him guilty and imposed an unspecified sanction. Ruoff is the Mayor and Chief Executive Officer of the Village and is responsible for the financial condition of the village and is the chief conservator of the peace. He is also the person responsible for hiring Officer Redmon.

On August 20, 1991, Rose filed for a trial *de novo* in Cuyahoga Falls Municipal Court. On September 12, his retained counsel filed a motion to dismiss. On September 23, 1991, the Village dismissed the charges against Rose, thereby terminating the case.

### THE BECKER ALLEGATIONS

Becker alleges that he was ticketed for speeding February 9, 1992 and appeared before the Mayor's Court on February 12. Becker entered a plea of not guilty and his case was continued to April 1, 1992. At the trial before Ruoff, Becker claimed that the officer mistook Becker's car for a similar car which passed his at high speed. Ruoff purportedly said, "This is one of my guys. He's a real good officer and I have no reason to doubt him." Ruoff found Becker guilty and imposed an unspecified sentence.

On April 8, Becker appealed to the Municipal Court and on April 23, filed a motion to dismiss. On May 13, the Municipal Court dismissed the case against Becker without ruling on the merits of the motion to dismiss.

### THE STATEMENT OF CLAIMS

In Count I, Rose and Becker claim that they were deprived of a substantive due process right to have their cases heard before a court of competent jurisdiction, in violation of 42 U.S.C. § 1983. Plaintiffs request a preliminary and permanent injunction and $20,000 jointly and severally from Ruoff and the Village as compensatory damages. In addition, plaintiffs pray for the sum of $250,000 in punitive damages from Ruoff. Plaintiffs' complaint includes a discussion of certain cases upon which this civil rights claim is based.

In form, Count II is substantially similar to Count I. The underlying facts, the remedy sought and the underlying legal theory are identical. The only difference is that Count II alleges a deprivation of the substantive due process right to have a case heard by a disinterested and impartial judge.

Count III applies only to Rose. This count alleges that Ruoff, Redmon and the Village conspired against Rose by "1) enforcing Village ordinances that are in conflict with and pre-empted by [Ohio law], by posting of Speed Limit signs that are fifteen (15) miles per hour lower than authorized by

State Law, and 2) by using such pre-empted and void signs and ordinances to seize, prosecute, and convict Plaintiff Rose of Municipal Ordinance violations in the Village of Peninsula Mayor's Court was outrageous, abhorrent, and an arbitrary abuse of power violative of Due Process of Law." (¶ 128.)

Count IV is also limited to Rose. Rose claims that the Village and Redmon violated his fourth amendment rights by seizing him "in the absence of probable cause or reasonable suspicion". (¶ 133.)

In Count V, Rose and Becker ask that Ohio Rev.Code § 2945.72(F) be declared unconstitutional. This section relates to extending time for trial when removal or change of venue is necessitated by judicial bias.

Finally, in Count VI, Rose claims that his rights to due process and equal protection are violated by a law which prohibits him from representing people in Mayor's Court because he is not a lawyer while Ruoff, the judge, is also not a lawyer.

### LAW & ANALYSIS

I. *Motion of All Defendants to Dismiss (Docket # 11).*

For purposes of clarity, the court will first examine the general objections to each count made on behalf of all defendants. The court will then examine the individual immunity arguments raised in the motions filed by defendants Ruoff and Redmon as they relate to counts not dismissed based on general infirmities.

A. *Counts I and II: Jurisdiction of the Mayor's Court and the Mayor.*

█ In Count I plaintiffs claim to have been deprived by defendant Ruoff and the Village of Peninsula of a fundamental liberty right of due process: the right to have their contested traffic cases heard in a court of proper jurisdiction. Similarly, in the allegations of Count II, plaintiffs claim a denial of due process, again by Ruoff and the Village of Peninsula, *viz.* the right to have a disinterested and impartial judge hear and decide their contested traffic cases. These counts shall be considered together because they

are substantially similar. This court's analysis which follows suggests that Count I is only valid if Count II is also valid.

1. *The Ohio Mayor's Court System.*

The Ohio Revised Code provides, in relevant part:

> the mayor of the municipal corporation has jurisdiction ... to hear and determine all criminal causes involving any moving traffic violation occurring on a state highway located within the boundaries of the municipal corporation, subject to the limitations of sections 2937.08 and 2938.04 of the Revised Code.

Ohio Rev.Code § 1905.01(A).

Section 2937.08 provides that "if the nature of the offense is such that right to jury trial exists, such matter shall not be tried before [the mayor] unless the accused, by writing subscribed by him, waives a jury and consents to be tried by the [mayor]." *See Brunswick v. Giglio,* 39 Ohio Misc.2d 5, 530 N.E.2d 37 (* * * * 1988) Section 2938.04 likewise provides for a jury trial before a court of record in compliance with Ohio Rev. Code § 2945.17 which authorizes jury trials in all causes involving penalties which exceed $100. A mayor's court is not a court of record.

In sum, by statute, the Peninsula Mayor's Court appears authorized to conduct trials in cases involving traffic violations occurring within the Village when the fine for such violation is $100 or less.

Recitations of the statutory provisions mentioned aside, however, plaintiff's contentions raise once again issues surrounding the legal propriety of the Ohio Mayor's Court system. This system has been the subject of judicial scrutiny for more than six decades.

2. *Early Supreme Court Review of Mayor's Courts.*

The Supreme Court took up the question of whether convictions by Ohio's mayor's courts satisfied the Fourteenth Amendment requirement of due process in *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (Taft, C.J.). *Tumey* involved fines

levied pursuant to the Ohio Prohibition Act which act extended the jurisdiction of the mayor's court county-wide to allow zealous communities to root out local alcohol dens harbored in more permissive surrounding communities. *Id.* at 520–21, 47 S.Ct. at 440. In addition to providing the legal authority to enforce prohibition, the Ohio Prohibition Act also provided financial incentives to stimulate enforcement of the law—fines collected from convictions were evenly split between the state and the convicting village. *Id.* at 521, 47 S.Ct. at 440.

But as ultimately discovered in *Tumey,* not only did the prosecuting municipality have a general interest in the monies to be collected, the mayor himself had a direct and personal stake. From May 11, 1923 to December 31, 1923, the mayor/judge received $696.35 above his regular salary collected from the monies collected from violators of the prohibition law. *Id.* In the particular case of defendant Tumey, the mayor received an additional $12.00 which he would not have received had Tumey been acquitted. *Id.* at 522, 47 S.Ct. at 440.

Responding to Tumey's claim that he was deprived of due process, the Court held:

> No matter what the evidence was against him, he had the right to have an impartial judge. He seasonably raised the objection and was entitled to halt the trial because of the disqualification of the judge which existed both because of his direct pecuniary interest in the outcome and because of his official motive to convict and to graduate the fine to help the financial needs of the village. There were thus presented at the outset both features of the disqualification.

*Id.* at 535, 47 S.Ct. at 445.

In the course of concluding that due process is denied when the judge must assume both judicial and partisan roles, the Court did observe:

> It is, of course, so common to vest the mayor of villages with inferior judicial functions that the mere union of the executive power and the judicial power in him cannot be said to violate due process of law. The minor penalties usually attaching to the ordinances of a village council, or to the misdemeanors in which the may-

or may pronounce final judgment without a jury, do not involve such addition to the revenue of the village as to justify the fear that the mayor would be influenced in his judicial judgment by that fact. The difference between such a case and the plan and operation of the statutes before us is so plain as not to call for further elaboration.

*Id.* at 534, 47 S.Ct. at 445.

The year after *Tumey,* the court revisited the issue of due process in Ohio mayor's courts in another context. *Dugan v. Ohio,* 277 U.S. 61, 48 S.Ct. 439, 72 L.Ed. 784 (1928) (Taft, C.J.). The Court upheld Dugan's conviction for violating the Prohibition Act because the mayor's relation to the funds collected was remote. Factually, *Dugan* differed from its predecessor case wherein Tumey was convicted. Xenia, Ohio, in contrast to the village in which *Tumey* was convicted, did not vest the mayor with exclusive executive power. Rather, Xenia had a five-member commission which exercised executive power through a city manager. The mayor was one member of the commission, but beyond that, the mayor's function was predominately judicial. Of import here, the mayor of Xenia had a set compensation which did not increase based on convictions. *Id.* at 63, 48 S.Ct. at 439. These characteristics distinguished *Dugan* from *Tumey.*

Here it must be noted that plaintiff's citation of these opinions is of historic value in analyzing the issue presented at this point of the decision. Defendant's reactive comments are neither legally persuasive nor professionally warranted.

It must be acknowledged, however, that with the passage of time *Tumey* has faded in the constitutional constellation and remains worthy of note only to the extent that it exerted influence over subsequent decisions more relevant to the instant cause both in time and subject. *Tumey* does not serve to illuminate the current debate. The minute dissection of *Tumey* engaged in by defendants is not germane in light of more recent Supreme Court opinions dealing with Ohio mayor's courts.

### 3. *Modern Supreme Court Review of Mayor's Courts.*

The Supreme Court revisited the due process implications of Ohio mayor's courts in *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972). *Ward* involved a due process challenge to two $50 fines imposed by a mayor on contested traffic violations.

> Conceding that "the revenue produced from a mayor's court provides a substantial portion of a municipality's funds," the Supreme Court of Ohio held nonetheless that "such fact does not mean that a mayor's impartiality is so diminished thereby that he cannot act in a disinterested fashion in a judicial capacity." [Village of Monroeville v. Ward,] 27 Ohio St.2d [179] at 185, 271 N.E.2d [757] at 761. We disagree with that conclusion.[1]

409 U.S. at 59, 93 S.Ct. at 82.

Accordingly, the Supreme Court explained:

> the test is whether the mayor's situation is one "which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused...." [*Tumey*, 273 U.S.] at 532 [47 S.Ct. at 444]. Plainly that "possible temptation" may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court. This, too, is a "situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, [and] necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him." *Id.* at 534 [47 S.Ct. at 445].

409 U.S. at 60, 93 S.Ct. at 83.

In a two-paragraph dissent, Justice White, joined by Justice Rehnquist wrote, in part:

> To justify striking down the Ohio system on its face, the Court must assume either that every mayor-judge in every case will disregard his oath and administer justice contrary to constitutional commands or that this will happen often enough to warrant the prophylactic, *per se* rule urged by petitioner. I can make neither assumption with respect to Ohio mayors nor with respect to similar officials in 16 other States. Hence, I would leave the due process matter to be decided on a case-by-case basis ...

409 U.S. at 62, 93 S.Ct. at 84 (White, J. dissenting). This dissent, to the extent that it suggests that the "Ohio system" was stricken on its face is somewhat misleading. In a footnote, the majority described explicitly the matters resolved by the decision:

> The question presented on this record is the constitutionality of the Mayor's participation in the adjudication and punishment of a defendant in a litigated case where he elects to contest the charges against him. We intimate no view that it would be unconstitutional to permit a mayor or similar official to serve in essentially a ministerial capacity in a traffic or ordinance violation case to accept a free and voluntary plea of guilty or *nolo contendere*, a forfeiture of collateral, or the like.

*Id.* at 62, fn. 2, 93 S.Ct. at 84, fn. 2. The Supreme Court did not declare the Ohio system unconstitutional. Rather, the Court appears to have declared that one particular practice of that system deprives individuals of due process. It seems to say that the system need not be dismantled; only the particular constitutionally offensive practice need be discontinued.

This interpretation is consistent with the majority's concern about "possible temptation" rather than temptation-in-fact. Likewise, the majority test is concerned that temptation "may" prejudice defendants rather than focussing on actual prejudice. The majority does not discuss the amount of revenue, either in absolute or relative terms

---

1. Defendants bend this passage to suggest that the majority rejected the Ohio Supreme Court's observation that "the revenue produced from a mayor's court provides a substantial portion of a municipality's funds." Plainly, the only reason-able interpretation of this passage is that given the importance of mayor's court funds to Ohio municipalities, the conclusion that the mayor-judge is disinterested is not correct.

which is sufficient to render the revenue "substantial". To the contrary, the Court seems to assume substantiality. *The analytical focus is on the functional role of the mayor in the municipal polity, not the role of traffic fines in municipal finances.*

Nothing in the majority opinion supports the mechanical approach advocated by defendants. To the contrary, mechanistic application of a formula to determine the substantiality of contributions to municipal coffers would be more consistent with the case-by-case approach supported by the dissent, not the majority. The legal propriety of requiring evidence of substantiality as an element of proving a deprivation must be questioned on still another basis. The first individual to appear before a mayor bent on filling the municipal coffer suffers exactly the same deprivation as the last person to do so. Defendants' theory would, however, deprive the first victim of constitutional protection because she had the misfortune of being harmed before a statistical predicate existed.

### 4. *Application of Ward.*

As a starting point, the parties must agree that *Ward* stands, at the very least, for the proposition that a mayor with executive powers may not decide contested traffic cases when the collection of traffic fines makes a substantial contribution to municipal finances. Exhibit 8 to plaintiffs' complaint indicates that in 10 months during 1988 Peninsula took in $45,780 or, approximately $80 per resident.[2] Plaintiffs' allegations are sufficient to overcome defendants' motion to dismiss under even this relatively narrow reading of *Ward.*

The harder question is whether actual substantiality remains an issue. As a matter of theory, requiring proof of actual substantiality seems to make constitutional protection dependent on certain predicate events which are irrelevant to the right protected. As previously stated, *Ward* suggests that substantiality is no longer an issue and this appears to be the approach followed by the Ohio Supreme Court in *State ex rel. Brock-*

*man v. Proctor,* 35 Ohio St.2d 79, 298 N.E.2d 532 (1973). That case involved a mayor who did not have exclusive executive powers. Nonetheless, in a seeming reflection of *dicta,* the court chose to include in the syllabus the following:

> The trial of a defendant charged with a traffic offense by a mayor acting as judge, who is also chief executive and administrative officer of the municipality, and who as such officer is responsible for the financial condition of the municipality, violates due process of law.

*Id.*

But that approach was implicitly rejected less than a decade later in *Covington v. Lyle,* 69 Ohio St.2d 659, 433 N.E.2d 597 (1982). The *Covington* syllabus provides:

> The mayor of a village, which is organized under R.C. Title 7, may try and decide a contested misdemeanor case without violating the constitutional right of the defendant to due process of law. (*State ex rel. Brockman v. Proctor,* 35 Ohio St.2d 79 [298 N.E.2d 532], distinguished.)

*Id.* 69 Ohio St.2d at 659, 433 N.E.2d 597. The court explained, "[t]he Municipal Court took judicial notice that '[r]evenue from the Mayor's Court does *not* constitute a *substantial portion* of the revenue of the Village of Covington.' (Emphasis added.) This fact distinguishes this case from *Monroeville, supra.*" *Id.* at 661, 433 N.E.2d 597. This fact was emphasized by Justice Brown who, while declining to find the mayor's court unconstitutional, still chose to write, "I believe that it serves no useful purpose in the administration of justice in Ohio. In my view, the Mayor's Court should be eliminated altogether, with county or municipal courts assuming jurisdiction over cases such as this." *Id.* at 665, 433 N.E.2d 597 (Brown, J., concurring).

Justice Holmes, joined by Chief Justice Celebrezze, dissented on the ground that substantiality is not the determining factor.

This court believes that the dissenters in *Covington* have the more correct interpretation of *Ward.*

---

**2.** Population is estimated to be 526 based on figures contained in the 1993 Rand McNally Road Atlas. The figures are ascribed to the 1990 Census or other reliable estimates. It is not clear whether the Peninsula listing is derived from the Census data.

Rose also bases his count I claim on the assertion that his violation occurred outside of Peninsula. Given the preceding analysis, it may not be necessary to reach the questions raised by this fact-specific claim. It appears that even if Rose were within the boundaries of the Village, the adjudication by the Mayor violated the holding of *Ward.*

It is not necessary at this juncture to definitively answer the question addressed by the dissenters in *Covington*—whether substantiality is the key factor. This court does agree with the dissent in *Covington;* under *Ward,* it is not necessary to establish a statistical predicate as defendants insist. For purposes of the motion to dismiss for failure to state a claim, however, plaintiffs have also sufficiently pled substantiality so even if there is some merit to defendants' interpretation of *Ward,* it can not be said that plaintiffs have failed to state a claim. Accordingly, with respect to Counts I and II, the joint motion to dismiss, docket #11, is denied.

B. *Count III: Deprivation of Due Process through Enforcement of Illicit Ordinances.*

■ Count III alleges that all defendants conspired to deprive Rose of his Fourteenth Amendment Due Process rights by enforcing village ordinances not authorized by law. (Complaint ¶ 128.)

■ According to plaintiff, the *prima facie* speed limit applicable to Route 303 is the limit set in the Ohio Revised Code for a state route in a municipality outside an urban district, 50 m.p.h. Ohio Rev.Code § 4511.-21(B)(6). Under Ohio law, a municipality may not alter such a *prima facie* speed limit. A local authority may pass a resolution indicating to the state Director of Transportation the belief that the statutory *prima facie* speed limit is greater than is reasonable and safe. The director may then investigate the resolution and declare a proper *prima facie* limit. Ohio Rev.Code § 4511.21(I). Ohio law does not convey to municipalities any unilateral authority to alter *prima facie* speed

limits without first securing the permission of the Director of Transportation.

Plaintiff alleges that Mayor Ruoff and officer Redmon conspired to erect 35 m.p.h. speed limit signs and enforce that limit without seeking state approval of the alteration.[3] Defendants' argue that the alleged conduct does not violate a fundamental right protected under the constitution. Consistent with this argument, defendants quote a variety of recent Supreme Court decisions advising courts to exercise self-restraint in extending the scope of substantive due process. *See e.g., Collins v. City of Harker Heights,* —— U.S. ——, ——, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992). Defendants advance the argument that "[p]osting and enforcement [sic] of a speed limit sign that is fifteen miles per hour less than the speed limit authorized by state statute does not impact on any fundamental right." (Docket #11 at 14.)

■ A § 1983 claim based on a deprivation of substantive due process through conduct other than excessive force must be based on a violation of an explicit constitutional guarantee or on conduct by the state which "shocks the conscience." *Fisher v. City of Detroit,* 1993 WL 344261 at 4, 1993 U.S.App. LEXIS 23277 at 6 (6th Cir.1993) (per curiam). Count III is not based on violation of a particular constitutional guarantee, such as the freedom of speech; rather, it appears that plaintiff wishes this court to find that the actions of defendants shock the conscience. Prior to *Fisher,* the Sixth Circuit expressed reservations about applying a "shocks the conscience" test to cases such as the one now under discussion. *See Cassady v. Tackett,* 938 F.2d 693, 698 (6th Cir.1991) (quoting *Braley v. City of Pontiac,* 906 F.2d 220, 224–25 (6th Cir.1990) ("We doubt the utility of such a standard outside the realm of physical abuse, an area in which the consciences of judges are shocked with some degree of uniformity.")).

Bearing in mind the concerns articulated by the Circuit in *Braley* and reiterated in *Tackett,* this court must now determine

---

**3.** Exhibit 9 to plaintiffs' complaint, a letter from the Director of the Ohio Department of Transportation dated January 17, 1992 confirms that no

alteration was granted and that the speed limit remains as specified in Ohio Rev.Code § 4511.-21.

whether the alleged conduct could constitute a deprivation of a substantive due process right. For guideposts, the court turns to recent Supreme Court opinions discussing fundamental rights and the substantive component of the Due Process Clause.

One of the rights included in the substantive component of the Fourteenth Amendment guarantee of due process of law is the "freedom from physical restraint." *See e.g., Reno v. Flores*, —— U.S. ——, ——, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1, 16 (1993) (acknowledging the existence of a fundamental "freedom from physical restraint" in a substantive due process inquiry). This freedom is central to the Fourteenth Amendment's intent "to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'" *DeShaney v. Winnebago Cty. Dept. of Social Services*, 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989) (quoting *Davidson v. Cannon*, 474 U.S. 344, 348, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986). In a footnote in a recent case, the Supreme Court repeated a discussion of the history of Due Process Clause cases: "This history reflects the traditional and common-sense notion that the Due Process Clause, like its forebear in the Magna Carta, [citation omitted] was 'intended to secure the individual from the arbitrary exercise of the powers of government,' *Hurtado v. California*, 110 U.S. 516, 527 [4 S.Ct. 111, 116, 28 L.Ed. 232] (1884)." *Collins*, —— U.S. at ——, n. 10, 112 S.Ct. at 1069, n. 10, 117 L.Ed.2d at 274, n. 10 (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986)).

This court believes that a knowledgeable municipal decision to post and enforce a *prima facie* speed limit lower than that authorized by law is arbitrary use of government power. Moreover, since this arbitrary exercise of power necessarily caused plaintiff to be detained, the instant conduct also concerns the freedom from restraint, a fundamental right of which the substantive component of the Due Process Clause plainly is concerned. While a citizen does not have a right to have a particular speed limit posted, it does appear that a citizen is entitled to some protection against being stopped and ordered to appear in court pursuant to the enforcement of an unauthorized municipal rule.

Plaintiff's allegation in count III comes in the context of general allegations that defendants were trying to increase municipal revenue through the enforcement of traffic laws. By unilaterally and without legal authority signing Route 303 for a substantially reduced *prima facie* speed limit, the defendants could substantially increase the potential number of apparent traffic offenses. The unauthorized signs created the improper appearance that individuals were violating the law when in fact they were not. Enforcement by agents of the Village of a more restrictive rule which the Village had no authority to make amounts to highly offensive conduct.

Given the Supreme Court's repeated reference to the Magna Carta, the court can not help but note that the very document which the Court has identified as the birth place of due process was in fact composed, in part, to combat enforcement of arbitrary revenue-enhancing royal rules not substantially different in nature from the arbitrary traffic rule enforced by defendants herein.

In short, the alleged conduct does not invite this court to formulate a new right to be enforced under the umbrella of substantive due process. Rather, plaintiff invites this court to find that the alleged enforcement by police of an illicit law for purposes of increasing revenues infringed his fundamental right to be free from physical restraint. The alleged conduct does implicate a well-known right plainly contemplated within the scope of substantive due process and may well be shown to be such as would shock the conscience of court's with some degree of uniformity. See *Braley*, 906 F.2d at 224–25. Circumstances of proof, of course, must confirm plaintiff's allegations. This opinion should not be read as suggesting plaintiff's factual allegations are proven or are true. The question, it should be repeated, is whether the complaint—or the portion of it under discussion, states a claim. Count III does state a claim.

### C. Count IV: Fourth Amendment.

■ Under Count IV plaintiff Rose claims a violation of his rights under the Fourth Amendment by the Village and Redmon through the conduct of seizing plaintiff pursuant to an allegedly invalid ordinance. Defendants argue that this count must be dismissed because plaintiff fails to allege the absence of reasonable suspicion or probable cause, necessary parts of a Fourth Amendment claim under § 1983. To the contrary, plaintiff has alleged an even more catastrophic failure by defendants. It appears irrelevant whether Redmon had probable cause to believe that plaintiff violated the posted speed limit. Plaintiff claims that he was seized pursuant to an illicit law designed purposefully to create a pretext for seizing citizens and trying to collect fines from them based on the false appearance of wrongdoing created by the Village's illicit speed limit signs.

Count IV should be regarded as adjunctive to Count III. As such, it too states a cause of action against all defendants.

### D. Count V.

Under Count V, plaintiffs claim Ohio Revised Code § 2945.72(F) is unconstitutional and ask for a declaration that it results in a denial of Due Process and Equal Protection by extending the time within which a person must be brought to trial in cases where removal or change of venue is necessitated due to potential bias. Defendants argue that this claim depends on the allegations in Counts I and II and, assuming that Counts I and II fail to state a claim, defendants also seek dismissal of Count V. Defendants' assumption is, however, erroneous. Since defendants advance no other argument regarding this count, the court declines to dismiss it.

### E. Count VI.

Under Count VI, plaintiff Rose seeks a declaration of the unconstitutionality of Ohio Rev.Code § 4705.01 which deals with the requirements and eligibility of attorneys to represent defendants. However, plaintiff has failed to allege any attempt or desire on his part to represent such defendants.

Plaintiff does not refute this argument in his response. Accordingly, Count VI must therefore, be dismissed.

### II. Officer Redmon's Motion for Qualified Immunity (Docket # 12).

Officer Redmon is named in Counts III and IV relating to the enforcement of the allegedly illegitimate Village-posted *prima facie* speed limit. Redmon now seeks dismissal under the guise of qualified immunity.

■ The doctrine of qualified immunity only applies to individual capacity claims, not to official capacity claims or claims against the government entity itself. *Kentucky v. Graham,* 473 U.S. 159, 166–167, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). Under the doctrine of qualified immunity:

> government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The relevant question in determining whether the defense of qualified immunity exists is whether the conduct complained of constituted a clearly established violation of statutory or constitutional law at the time it occurred. *Ohio Civil Service Employees v. Seiter,* 858 F.2d 1171, 1174 (6th Cir.1988).

■ According to *Siegert v. Gilley,* 500 U.S. 226, ——–——, 111 S.Ct. 1789, 1792–93, 114 L.Ed.2d 277, 286 (1991), the first inquiry this court must make is whether plaintiff successfully alleged the violation of a constitutional right at all. This inquiry is similar to the inquiry made in determining whether plaintiff stated a claim for the Fed. R.Civ.P. 12(b)(6) motion filed on behalf of all defendants.

■ Defendant's motion for qualified immunity relating to Count III relies solely on the argument that, "[s]ince Count III alleges no act or omission of defendant Redmon that could be the basis of federal constitutional liability, Count III states no claim upon which relief can be granted against defen-

dant Redmon under 42 U.S.C. § 1983." (Docket # 12 at 8.) As support, defendant merely incorporates arguments made on behalf of all defendants in docket # 11.

As previously noted, Count III does articulate a federal claim. Since failure to state a federal claim is the *only* ground defendant chose to advance for purposes of arguing for qualified immunity and that ground is incorrect, defendant's motion as it relates to Count III is denied.

With respect to Count IV, defendant first argues that he could not glean the specific allegations against him from the plaintiff's complaint. This court had no such problem and declines to conclude that plaintiff's complaint suffers from a lack of specificity. To the contrary, it is very apparent which allegations relate to defendant Redmon and Count IV.

Beyond arguing that the complaint was not sufficiently detailed and explicit, defendant resorts to the reasoning previously discussed in connection with Count III—invoking plaintiff's failure to allege the violation of a federal claim. *See e.g.* Docket # 29 at 3 (reasserting the propriety of dismissal because plaintiff failed to state a federal claim). Count IV, like Count III, does state a federal claim, therefore the motion for qualified immunity argued for Count IV is also meritless.

### III. *Mayor Ruoff's Motion for Judicial and Qualified Immunity (Docket # 13).*

#### A. *Absolute Judicial Immunity.*

■■■ In addition to the doctrine of qualified immunity discussed with reference to Redmon, federal courts recognize a doctrine of absolute judicial immunity in civil cases for monetary damages. This doctrine was reaffirmed in *Mireles v. Waco*, —— U.S. ——, ——, 112 S.Ct. 286, 287, 116 L.Ed.2d 9, 13 (1991).

> Although unfairness and injustice to a litigant may result on occasion, "it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself."

*Id.* ——, 112 S.Ct. at 287, 116 L.Ed.2d at 13 (quoting *Bradley v. Fisher*, 13 Wall. 335, 347, 20 L.Ed. 646 (1872)). This doctrine does not apply to suits for prospective injunctive relief. *Pulliam v. Allen*, 466 U.S. 522, 536–43, 104 S.Ct. 1970, 1977, 80 L.Ed.2d 565 (1983). Only two exceptions to this doctrine exist. First, nonjudicial actions are not protected under the umbrella of absolute judicial immunity. *Id.* —— U.S. at —— – ——, 112 S.Ct. at 287–88, 116 L.Ed.2d at 14. Second, a judge is not immune if his action is, "though judicial in nature, taken in the complete absence of all jurisdiction." *Id.*

■■■ The conduct alleged in Count III relating to setting *prima facie* speed limits in the Village of Peninsula is not a judicial function so judicial immunity does not apply to Count III.

■■■ As to Count I, plaintiffs allege that Ruoff operated in the complete absence of jurisdiction because *Ward* held that a Mayor who also functions as chief executive of a municipality can not hear contested traffic cases when the municipality takes in revenue from such cases. In *Covington*, however, the Ohio Supreme Court appears to suggest that a Mayor does have jurisdiction in cases like this. As previously discussed, this court believes that the majority in *Covington* did not correctly apply *Ward*. Notwithstanding that conclusion, for purposes of determining whether a judge acted in complete absence of jurisdiction, it is proper for this court to examine the decisions of courts which supervise the judge. In this case, while this court believes that the superior precedent is erroneous, it was nonetheless precedent upon which Ruoff apparently relied. In light of *Covington*, it would be improper to hold that *Ward* rendered Ruoff's actions completely without jurisdiction.

Plaintiff Rose also argues that Ruoff acted in the complete absence of jurisdiction because the citation plaintiff was issued indicated that the infraction occurred as he proceeded eastbound on Route 303 at the intersection with Dogwood Lane, and thus would not have been in the Village of Peninsula and therefore outside the territorial jurisdiction of the Peninsula Mayor's Court. Defendant

528

points out that plaintiff has not alleged that he was not, in fact, speeding in the Village. Rather, plaintiff argues that his citation does not, on its face, reflect that he was in the Village. Defendant also argues that it is a common and well known practice of police officers to identify the location of traffic stops by nearby intersections rather than providing exact measurements which would permit pinpoint determination of whether a defendant was within the Village.

Notwithstanding the face of the citation, it does not appear that it was unreasonable for Ruoff to conclude, as a factual matter, that the alleged traffic violation occurred within his judicial jurisdiction. Every judge must ascertain whether a cause before him is properly within his jurisdiction. In some cases, the judge must rest this decision on the determination of a contested factual matter. Given that this court can not say that Ruoff's determination of that factual matter was unreasonable, it would be improper to say, based on this geographic argument, that Ruoff acted in the complete absence of jurisdiction.

Therefore, absolute judicial immunity should apply to the claim for monetary damages made under Count I. Mayor Ruoff is not, however, dismissed from Count I, because it also seeks prospective injunctive relief which is exempted from the judicial immunity doctrine.

### B. *Qualified Immunity.*

Ruoff also seeks dismissal from Count III based on qualified immunity. Defendant's argument is a verbatim copy of defendant Redmon's, resting solely on the assumption that Count III fails to state a claim. Given this court's conclusion that Count III does state a claim and defendant's failure to argue any other basis for qualified immunity, the dismissal sought must be denied.

### CONCLUSION

The motion of all defendants for dismissal, docket # 11, is GRANTED in part and DENIED in part. Count VI is dismissed against all defendants. No other counts are dismissed under this motion.

The motions of the individual defendants to dismiss based on qualified immunity explicitly chose to address one very narrow component of qualified immunity analysis. In this regard, the motions are unusual. While the motions provided a boiler-plate recitation of qualified immunity law, both motions only sought to apply the limited proposition that a defendant has qualified immunity when the plaintiff fails to allege a federal claim. Defendant effectively responded to the arguments made.

Given the conclusion that federal claims were articulated, qualified immunity, as sought by defendants, must be rejected. Defendant Redmon's motion is DENIED in full.

The court does, however, find merit in defendant Ruoff's assertion of judicial immunity with respect to Count I. Therefore, defendant Ruoff's motion is GRANTED in part and DENIED in part. The claim for monetary damages from Ruoff in his individual capacity is dismissed.

IT IS SO ORDERED.